## Renaker v. Commonwealth.

(Decided December 15, 1916.)

### Appeal from Mason Circuit Court.

1. Criminal Law—Evidence—Admissions of Accused—When Competent.—Testimony of an accomplice as to an admission by the accused of his guilt, corroborated by that of a third person in whose hearing it was made, is competent evidence against the accused, although the admission was made in an interview between the accomplice and accused arranged by the former and the third person concealed for the purpose of hearing the admission; it appearing that the admission was not influenced by threats or promises of reward by anyone having the accused in charge.

2. Criminal Law—Appeal and Error—Ruling as to Indictment not Subject to Review.—In a criminal prosecution the Court of Appeals is precluded by section 281, Criminal Code, from reviewing on appeal the refusal of the trial court to quash the indictment, that section declaring that the decisions of the trial court upon motions to set aside an indictment shall not be subject to review.

3. Arson—Evidence—As to Insurance on House Burned is Substantive.—In a prosecution under section 1169, Kentucky Statutes, making it a felony to burn a house upon which there is insurance, evidence that the house was insured is necessary to establish the guilt of the accused, hence testimony of an insurance agent to that effect was competent as substantive evidence, and the court was not required to admonish the jury that it was competent only for the purpose of establishing motive.

4. Criminal Law—Appeal and Error—Preservation of Grounds on Trial—Failure to Admonish Jury.—Defendant cannot on appeal take advantage of the failure of the trial court to admonish the jury as to the effect of certain evidence, where it does not appear from the record that he at the time called the court's attention to the error or requested it to give such admonition.

5. Criminal Law—Punishment—Statutory Provision—What Law Governs.—The law in force at the time the crime was commit-

ted must control the trial court in giving its instructions and the jury in fixing the punishment of the accused, if found guilty, hence where the indeterminate sentence law was in force when the crime was committed, the punishment of the accused was properly fixed thereunder.

6. Criminal Law—Trial—Instructions—Definition of Terms Not Used in Instructions Unnecessary.—In a criminal prosecution it is not necessary for the trial court to define terms not appearing in the instructions.

7. Criminal Law—Definition of Terms.—Where an instruction on conspiracy so clearly stated the law that the jury could not have failed to understand the legal meaning of the word "conspiracy," it was not necessary to define it in the instructions.

8. Criminal Law.—While the words "willful," "willfully," "maliciously," and "feloniously," appearing in the instructions, might properly have been defined by the trial court, failure to do so will not authorize a reversal where the instructions aptly stated the law.

9. Criminal Law—Instructions—Reasonable Doubt.—In a criminal prosecution an instruction worded, "Unless the jury believe from all the evidence beyond a reasonable doubt that the defendant has been proven guilty, they will find him not guilty," held to substantially follow the language of section 238, Criminal Code.

10. Arson—Sufficiency of Indictment.—In a criminal prosecution under section 1169, Kentucky Statutes, denouncing the willful and unlawful burning of a building upon which there is any insurance, the indictment alleged that the building burned was insured, but not that it was insured against loss by fire; held, that without the latter allegation the indictment stated a public offense, hence such omission was not ground for arrest of judgment.

11. Criminal Law—Evidence—Testimony of Accomplice—Sufficiency of when Corroborated.—The testimony of an accomplice, corroborated in part by defendant's own testimony, by testimony of a third person as to admission of guilt made by defendant in his hearing, and by other evidence tending to show the commission of the crime, the circumstances thereof, and to connect defendant with its commission, is sufficient, under section 241, Criminal Code, to warrant a conviction.

12. Arson—Evidence—Sufficiency.—In a prosecution for conspiracy to burn and burning of a house upon which there was insurance, held that the evidence established both the conspiracy and commission of the crime contemplated, and is sufficient to authorize the verdict of guilty.

ALLAN D. COLE for appellant.

M. M. LOGAN, Attorney General, and D. O. MYATT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This appeal brings to us for review a judgment of the Mason circuit court entered upon a verdict finding the appellant, Barry Renaker, guilty of the crime of house-burning and fixing his punishment at confinement in the penitentiary not less than two years nor more than three years. The indictment under which appellant's conviction was had, in substance, accused him of conspiring with one Ennis Williams to burn a slaughtering or packing house at Marshall station, in Mason county, used for the slaughter and packing of turkeys and other poultry; that pursuant to such conspiracy Williams burned the packing-house by appellant's procurement and that the building, which was the property of the appellant, was at the time insured in the Liverpool, London & Globe Insurance Company.

Briefly stated, the facts shown by the evidence of the Commonwealth were that Williams was hired by appellant to burn the packing-house and assured by him that as the property belonged to him (appellant) there would be no danger in his doing so. Williams when first spoken to by appellant on the subject seemed reluctant to undertake the service required of him, but in a later interview with appellant agreed to do so upon the latter's promise to pay him $250.00. Thereupon, at the request of appellant and with money furnished by him, Williams purchased in Cynthiana, where they both resided, five gallons of coal oil, two gallons of which were bought at one place, two at another and one at a third place. This coal oil he took to appellant, who put the whole of it in a five-gallon jug and at the time requested Williams to return the next morning and take the boxes for him to the railroad station at Cynthiana, for shipment to the packing-house at Marshall station, in Mason county. On the following morning, which was December 6, 1915, Williams went to appellant's house as requested, was given by the latter a railroad ticket entitling him to ride from Cynthiana to Marshall station and asked by him to take the two boxes to the station and have them checked to Marshall station, at the same time informing him that one of the boxes, which was about seventy pounds heavier than the other but of the same size, contained the five gallons of coal oil purchased the previous day. Williams had the boxes checked to Marshall station as directed, but by further direction of appellant did not himself go to Marshall station that day. On the morning of the next day,

which was December 7th, he did, at appellant's request, go to Marshall station for the purpose, as the latter told him, of examining the premises and being advised by appellant of the manner of burning the packing-house. Before taking the train, however, Williams went to the railroad ticket agent at Cynthiana to ascertain of him whether the ticket which appellant had bought and given him on the previous day would still entitle him to ride on the train to that station. Being advised by the agent that it could not be so used, he, by the direction of the latter, returned to him the ticket for cancellation and received the money thereon. Williams then obtained from appellant five dollars for the Marshall station trip and thereafter purchased another ticket which he used to pay his fare on the Cynthiana and Maysville train to Marshall station, upon reaching which he went to the packing-house and was shown by appellant over the building, told where he would find the coal oil and where to start the fire. He was also directed by appellant to empty the fire extinguisher before starting the fire in the building. On the morning of December 16th appellant again saw Williams, told him to burn the packing-house that night, provided him with ten dollars, gave him the key to the packing-house, a flashlight to use after entering it, directed him to procure a pair of overshoes, and instead of buying a ticket from Cynthiana to Marshall station to get one from Cynthiana to Paris and after the arrival of the train at Paris there buy another ticket to Mill Creek, a station two miles south of Marshall station, leave the train at Mill creek and walk from there to Marshall station and in the darkness of the night set fire to the packing-house. Complying with the above directions, Williams arrived at Mill Creek on the afternoon of December 16th and from there walked to Marshall station, which he reached about 5:30 o'clock. Shortly thereafter he went to the packing-house, unlocked a door with the key given him by appellant and upon entering the building turned on the flashlight and found the coal oil and fire extinguisher where appellant had told him they would be. The coal oil was still in the five-gallon jug into which it had been poured at Cynthiana. Williams then emptied the fire extinguisher, poured the coal oil over parts of the building and after setting fire to it with matches, left the building, locked the door and started on his way to Maysville. He discovered, however, before he got out

of sight of the building that the fire started by him had obtained full headway. Shortly thereafter he encountered a man upon the road who remarked that Renaker's poultry house at Marshall station was on fire. The man then went on in the direction of Lewisburg, a village near Marshall station. Williams himself soon arrived at Lewisburg, but before doing so, threw the key, with which he had entered the packing-house, and the flashlight into a creek. At Lewisburg persons on the streets were standing in groups discussing the fire, from one of whom Williams obtained a match. From Lewisburg he went immediately on to Maysville, thence on a Chesapeake & Ohio train to Cincinnati, from which city he returned by rail to Cynthana on the afternoon of the following day, arriving in Cynthiana in the early part of the night. On the way from Cincinnati to Cynthianá he threw away the overshoes which he had worn the night before. On Saturday morning following his return to Cynthiana he had an interview with appellant, who asked him if he had burned the packing-house, to which Williams replied: "I sure did; I could see the blaze three miles off." Appellant then said, "I got a telegram that she was burned straight down." At this interview appellant gave him twenty dollars and promised to later pay him the remainder of the $250.00 he was to receive for burning the packing-house.

The facts thus far stated were furnished by the testimony of Williams alone. Williams was arrested in Cynthiana on the 19th day of January, 1916, charged with the burning of appellant's packing-house and immediately thereafter taken to Maysville where he was incarcerated in jail. On the next day he called appellant up by telephone, informed him of his arrest and demanded his assistance in being released from jail. Appellant went at once to Maysville in his automobile and upon getting there immediately saw and talked with Williams at the jail. Before his arrival at Maysville, however, Williams had confessed his guilt to the local officers, but this fact was unknown to appellant until some time the next day. One Stewart, a detective in the employ of the Chesapeake & Ohio Railroad Company, had been engaged by a member of the state fire marshal's department to investigate the burning of appellant's packing-house. Knowing of the coming of appellant Stewart placed himself in a cell close to that in which

Williams was confined, to hear what was said in the interview between the latter and appellant, to accomplish which purpose he feigned to be drunk or crazy. According to the testimony of Williams appellant in that interview asked him, "Have you said anything?" To which Williams replied, "I have nothing to say only that I am here." Appellant then told him he would get him out, that he knew the county judge, Rice, and would get him to reduce the bond. Stewart admitted that this conversation was unheard by him because it was conducted by appellant and Williams in a whispering tone of voice. Appellant left after this interview but returned to the jail later in the day and informed Williams that Judge Rice was out of town but that he would stay in town until he got him out. Appellant did not again see Williams until the following morning, when he went to the jail and had another conversation with him. Before this interview took place, however, Williams had been placed in the hospital room of the jail and his conversation in the last interview with appellant occurred in that room. This conversation Stewart, the detective, who was at the time concealed in an adjoining cell behind some bed clothing, claimed to have overheard, and according to his testimony, as well as that of Williams, this conversation was carried on in an audible tone of voice. So much of it as bore upon the burning of the packing-house was as follows:

Williams said to appellant, "Was the place insured?" To which the latter replied, "Hell, yes, for four thousand dollars. . . . that is what they are after, they don't want to do a damn thing with you." Appellant also said, "Don't talk so loud, someone might be listening," to which Williams replied, "I guess not." Following this statement Williams also said, "I want some money. My wife is sick and I am in trouble." Appellant then told him, "I will go by and give her some." Upon being asked by appellant who identified him Williams said, "Captain Hibler and the chief detective, Helm; he got my footprints and everything." Appellant then said, "We are as smart as him; don't give it away; I will get some witnesses to get you out." To which Williams replied, "All right, go ahead and do so."

Appellant's arrest followed this interview. Stewart, upon being introduced as a witness by the Commonwealth, fully corroborated the testimony of Williams as

to what occurred between himself and appellant in the interview last referred to. Thomas Gaither, agent of the Louisville & Nashville Railroad Company at Marshall station, testified that he telegraphed appellant information of the burning of the barn shortly after it occurred, and also that appellant, on December 15th, the day before the fire, shipped from the packing-house by rail all the poultry he then had on hand. W. H. Rice, county judge of Mason county, testified that appellant told him on the 19th or 20th of January, with reference to the charge against Williams, that he had the wrong man and that he (appellant) wanted to arrange bail for Williams in order that he might be released from jail. It was shown by the testimony of J. G. Wadsworth, an insurance agent of Maysville, and by that of Addie Robinson, his stenographer, that at the time of the fire there was insurance upon the packing-house to the amount of $4,000.00, which had been procured by appellant through Wadsworth on December 18, 1914, ran for a year from that date and would have expired two days after the fire; and further, that Wadsworth was notified by appellant the day after the fire of the loss of the building. It was shown by the testimony of the county clerk that the title to the packing-house property was in the appellant. In further corroboration of Williams' testimony the Commonwealth introduced S. P. Hibler, a conductor on the Louisville & Nashville Railroad train, who identified Williams as the man that got off the train at Mill Creek the night the packing-house was burned, that he rode from Paris to Mill Creek and had a ticket between those points which the witness received from him after leaving Paris. J. L. Fitzpatrick, baggage agent for the Louisville & Nashville Railroad Company at Cynthiana, also introduced by the Commonwealth, testified that the two boxes described by Williams were checked from Cynthiana to Marshall station December 6, 1915, but that according to his recollection the ticket or tickets upon which they were checked were purchased by appellant. He further testified, however, that these tickets were not used on that day and that they were on the following day presented by Williams to the station agent at Cynthiana, who received upon them from the agent a return of the money which had been paid for them. According to his further testimony, Williams was seen by him in the sitting-room of the depot December 7, 1915, which was the day the

latter claimed to have gone to Marshall station to meet appellant and determine the method of burning the building. Clyde Berry, a resident of Lewisburg, introduced by the Commonwealth, testified that on the night of the fire he met a negro answering Williams' description near Marshall station about the time he observed appellant's packing-house on fire; that he returned to Lewisburg and gave the alarm and a few minutes later was approached by a negro looking like the one he met near the place of the fire and was by him asked for a match. Berry expressed the opinion that when the fire was discovered by him it had the appearance of having started inside the building. Richard Berry, another witness for the Commonwealth, testified substantially as did Clyde Berry, and Cooper Fitch, another witness, testified that he saw Williams at appellant's packing-house shortly before the fire, at which time he was standing around apparently doing nothing.

Appellant, testifying in his own behalf, admitted the purchase of the railroad tickets on December 6th and the checking of the two boxes, as described by Williams, from Cynthiana to Marshall station as baggage, but denied that the boxes contained coal oil or that any coal oil was purchased for him by Williams. He also denied that he hired Williams to burn the packing-house, showed him how to burn it, or that he for that purpose paid him any of the sums of money Williams claimed to have received from him to burn the packing-house. He admitted the interview with Williams in the jail referred to and that he made an effort to get him released from custody, but denied that he made, in any conversation with Williams, the statements, or any of them, attributed to him by the testimony of Williams and Stewart. In support of appellant's testimony that the two boxes sent by him from Cynthiana to Marshall station did not contain coal oil, he introduced two witnesses, Cooper Fitch and Arthur Lemons. Fitch testified that he carried the boxes from the depot at Marshall station to appellant's packing-house and saw them opened upon their arrival at the latter place; that one of them contained bed clothing and the other saws, hatchets, hammers and nails, and nothing more. Lemons testified that he went with appellant on the train from Cynthiana to Marshall station that carried the two boxes; that he saw their contents before leaving Cynthiana and that there was nothing in either

of them except bed clothing, the working apparel of appellant and himself and the saws, hatchets, hammers and nails. Lemons also testified that he saw Ennis Williams at the packing-house of appellant December 7, 1915, the day upon which the boxes arrived there; that Williams remained there until one o'clock and that he did not see him with appellant while there; that he (the witness) worked at the packing-house for appellant from December 7th until December 15th and on that day left Marshall station and returned on the train to Cynthiana, where he arrived about 8:17 o'clock that evening; that he saw Ennis Williams that night and had a conversation with him in the presence of Russell Vaughn; that Williams was then drinking, talking about going to Marshall station to get work, saying that appellant would not give him work and he (Williams) would get even with him. Russell Vaughn, who also testified for appellant, corroborated what was said by Lemons as to the statements of Williams on the occasion referred to.

In addition to the evidence already mentioned, appellant introduced a number of witnesses who testified as to their familiarity with the reputation of Ennis Williams for veracity and morality and that it was bad. The Commonwealth did not attempt to prove a good reputation for Williams. Indeed, its counsel concede it is as bad as testified by appellant's witnesses, but insist that no other evidence was necessary to show it bad than was furnished by his confession that he burned the packing-house and was hired by appellant to do so; and, obviously, if the building was burned by appellant's procurement, he would naturally have called upon a man of bad character like Williams to commit the crime. Notwithstanding the bad character of Williams, it appears from appellant's own testimony that he had him in his employ at the packing-house and elsewhere for several years and, indeed, down to within a few days of the burning of the packing-house. However unworthy of belief the jury, under other circumstances, might have been disposed to regard Williams, the strong corroboration given his testimony by that of Stewart as to appellant's admissions of his guilt at the jail, the conduct of appellant in hastening to his relief when informed of his arrest and in trying to procure his discharge from jail, together with his removal and shipment from the packing-house just before the fire of the entire product of the business therein, and

the fact that the insurance upon the property was very large and on the eve of expiring, evidently induced the jury to accept the truth of Williams' testimony and reach the finding expressed by their verdict, viz.: that appellant was a guilty participant in the crime committed by Williams.

The state of case made by the evidence here is that it establishes both the conspiracy and commission of the crime contemplated by the conspiracy, by the confession in court of Williams, one of the conspirators, and the latter's testimony of the admission by appellant, the other conspirator, of his guilt, such testimony being corroborated by that of a third person, in whose presence and hearing the admission was made; in addition to which, Williams' testimony as a whole is corroborated by other evidence in the record, previously indicated, tending to show the commission of the crime, the circumstances thereof, and to connect appellant with its commission. Sections 240, 241 Criminal Code; Green v. Commonwealth, 26 R. 1221; Patterson v. Commonwealth, 99 Ky. 610. The competency of the testimony of Williams and Stewart as to the admissions of guilt made by appellant to the former, is not affected by the fact that they were obtained in an interview between Williams and appellant arranged for the purpose, at which Stewart was a concealed witness, that his presence might not be known to appellant, for a confession of the accused out of court is competent evidence against him, although it may have been procured by deception. Wigginton, etc. v. Commonwealth, 92 Ky. 282. To render evidence of such confession incompetent, it must have been influenced by promises, threats or advice of the prosecutor or officer having the prisoner in charge, or of anyone having him in duress or having authority over him. Young v. Commonwealth, 8 Bush 366; Rector v. Commonwealth, 80 Ky. 468; Butler v. Commonwealth, 2 Duvall 435; Taylor v. Commonwealth, 19 R. 386.

After a careful consideration of the evidence, we are unwilling to say that it was not sufficient to authorize the verdict.

Although twenty-two grounds were urged by appellant in support of his motion for a new trial made in the court below, we will consider only such of them as are relied on by his counsel in asking a reversal of the judgment; it being a well known rule of this court that

its time will not be wasted in examining the record to ascertain whether an error, overlooked by the vigilance of counsel, may be discovered that would authorize a reversal.

The matters complained of as error in the brief of counsel are: (1) Refusal of the trial court to quash the indictment; (2) failure of the trial court to admonish the jury of the purpose for which they might consider the testimony of the witness James Wadsworth; (3) failure to admonish the jury as to the purpose for which they might consider the testimony of the witness James Mackey; (4) failure to properly instruct the jury; (5) failure to sustain appellant's motion in arrest of judgment.

Appellant's first complaint cannot be considered by us. We are precluded from doing so by section 281, Criminal Code, which provides:

"The decisions of the court upon challenges to the panel, and for cause, *or upon motions to set aside an indictment,* shall not be subject to exceptions."

Appellant's second complaint cannot be sustained. The trial court was not required to admonish the jury as to the purpose for which James Wadsworth's testimony might be considered. It more than conduced to show the motive of appellant for committing the crime. It was substantive evidence because necessary to show a fact essential in establishing appellant's guilt; that is, Wadsworth's testimony showed that there was at the time of the fire insurance upon the property burned, which had been procured and paid for by appellant; and the crime denounced by the statute, and charged in the indictment, of which appellant was convicted, was the burning of a house upon which there was insurance. The language of the statute, section 1169, Kentucky Statutes, being:

"If any person shall wilfully and unlawfully burn a powder house . . . . . ; or dwelling house or other building, or *house upon which there is any insurance or lien,* he shall be confined in the penitentiary not less than one nor more than six years."

Besides, if it were true, as contended by counsel for appellant, that the testimony of Wadsworth was competent only for the purpose of showing a motive on the part of appellant for the burning of the building, the failure of the court to admonish the jury that it could be

considered by them only for that purpose would not constitute reversible error, as it does not appear from the record before us that the court was requested by appellant or his counsel to give the jury such an admonition. We have repeatedly held that in order for the accused to take advantage of such an error on appeal, he must have called the attention of the court to it at the time it was committed and thereby allowed it an opportunity to correct the error. Ochsner v. Com., 128 Ky. 761; Wright v. Com., 155 Ky. 750; Hayes v. Com., 171 Ky. 291.

For the reason last stated we are unable to consider appellant's third complaint, referring to the trial court's failure to admonish the jury as to the purpose for which the testimony of the witness James Mackey might be considered. It is, therefore, unnecessary for us to decide whether the testimony of Mackey was of a substantive character, as argued by counsel for the Commonwealth, or only competent for the purpose of contradicting the appellant, as contended by his counsel, as it does not appear from the record that the trial court was requested by appellant to admonish the jury as to the purpose of its admission, nor that the failure to give such admonition was at the time objected to by him.

The objections urged in appellant's fourth complaint, to the instructions given by the trial court, are without merit. The first of these objections is to instruction No. 3, it being insisted that the direction it gave the jury, if it found appellant guilty, to fix his punishment as provided by section 1136, Kentucky Statutes, known as the Indeterminate Sentence Law, was error, because that law was repealed before the indictment under which he was convicted, was returned. This contention ignores the fact that the section of the statute, *supra*, was not repealed until March 23, 1916, consequently it was in force December 16, 1915, when the crime of which appellant was convicted was committed, and we have repeatedly held that the law in force at the time the crime was committed must control the court in giving its instructions, and the jury in fixing the defendant's punishment, if found guilty of the crime. Therefore in this case the law in force when the indictment was returned or the appellant was tried could not properly have been applied by the court or jury in fixing his punishment. Quinlan v. Commonwealth, 149 Ky. 476; Dial v. Commonwealth, 142 Ky. 32; DeMoss v. Board of Prison Com'rs, 157 Ky.

289; Coleman v. Commonwealth, 160 Ky. 87; Albritton v. Commonwealth, 172 Ky. 274.

Appellant also complains of the failure of the court to define in the instructions the words "criminal conspiracy," "motive," "willful," "willfully," "maliciously" and "feloniously." We fail to find anywhere in the instructions the words "criminal conspiracy," consequently it was not necessary that that term be defined. It is true the word "conspiracy" appears in instruction No. 1, but as that instruction advised the jury that in order to find appellant guilty of the crime charged in the indictment it was necessary for them to believe from the evidence beyond a reasonable doubt, first, that there was a conspiracy between appellant and Williams, the object of which was to set fire to and burn the former's packing-house, and second, that it must have been burned in pursuance of such conspiracy, this statement of the law did, in effect, constitute such a definition of the word conspiracy that the jury could not have failed to understand its legal meaning. We also fail to find the word "motive" in the instructions, hence a definition of its meaning was not required, nor can its absence be said to have been prejudicial to any substantial right of the appellant. While the words "willful," "willfully," "maliciously" and "feloniously," appearing in the instructions, might properly have been defined by the court therein, we have held that the failure to do so, particularly where the instructions as aptly state the law as was done in this case, will not authorize a reversal of the judgment. Banks v. Commonwealth, 145 Ky. 800; Collier v. Commonwealth, 160 Ky. 338; Nichol v. Commonwealth, 169 Ky. 491; Rucker v. Commonwealth, 171 Ky. 276.

We fail to see any reason for appellant's criticism of instruction No. 4, which is as follows:

"Unless the jury believe from all the evidence, beyond a reasonable doubt, that the defendant has been proven guilty, they will find him not guilty."

In the form given the instruction substantially follows the language of section 238, Criminal Code, which declares:

"If there be a reasonable doubt of the defendant being proven to be guilty, he is entitled to an acquittal." Mearns v. Commonwealth, 164 Ky. 213.

Time will not be consumed in discussing appellant's contention that the court erred in refusing to peremptorily instruct the jury to find him not guilty, as the contention finds no support from anything appearing in the record. The case of Lane v. Commonwealth, 134 Ky. 519, relied on by appellant's counsel, is not authority in point. The houseburning there charged was a crime defined by section 1170, Kentucky Statutes. The fact that the house was insured was not material, although allowed to be proved merely to show a motive on the part of the defendant for the crime, and the failure of the trial court to give an instruction directing the acquittal of the defendant we held to be error, because of the total absence of evidence tending to corroborate the testimony of the accomplices; whereas, here the indictment was returned and appellant's conviction had under section 1169 of the statute, and the existence of insurance on the building burned was an ingredient of the offense. Moreover, in this case there was, as we have already seen, an abundance of evidence corroborating that of the accomplice.

Appellant's final and most strongly urged contention is that the trial court erred in overruling his motion for an arrest of judgment. The single ground upon which the motion could have been based is that allowed by section 276, Criminal Code, which provides:

"The only ground upon which judgment shall be arrested is that the facts stated in the indictment do not constitute a public offense within the jurisdiction of the court."

It is not denied by appellant's counsel that the indictment, in alleging the facts constituting the offense and describing the building burned, substantially follows the language of the statute which itself fully describes the offense, but complained that the indictment does not state a public offense because of its failure to allege that the building burned was insured against loss by fire. It will be observed from a reading of its language that the statute nowhere provides that in order to constitute the offense the house or building burned should be insured against fire. The mere allegation in the indictment that the building burned was insured seems to state a public offense. Whether, if it were shown on a trial of one indicted under the statute that the insurance upon the property was not against loss by fire, but against its loss by lighting or cyclone, a public offense would be proven, is

not necessary to be here decided, as that question is not before us. The fact is that the property alleged in this case to have been destroyed was insured against fire. While the indictment might have been made more definite by alleging that the building was insured against loss by fire, the absence of such an allegation does not manifest a failure of the indictment to charge a public offense. As the burning of dwelling houses and other buildings which are uninsured is made a felony by and punishable under other sections of the statute, it would do no violence to the meaning of section 1169 to say that it was enacted more particularly to remove the incentive to gain by which evilly disposed persons may be led to procure over-insurance upon buildings or other property and then burn the same to obtain the insurance; hence the insurance, the existence of which upon the property at the time of the fire the section, *supra,* declares necessary to make the burning thereof a crime, can be only insurance against loss by fire, for the burning of a building or other property upon which there is only insurance against loss by wind or lightning could bring no profit to anyone.

If correct in this conclusion, no reason is perceived for holding that the indictment should not be declared sufficient, even on demurrer, and certainly none for holding that it does not state a public offense. Obviously, appellant knew that the insurance on the building burned was insurance against loss by fire, and an allegation in the indictment that such was its character was, therefore, unnecessary. In Wright v. Commonwealth, 155 Ky. 750, the appellant Wright was convicted under an indictment under the same section of the statute here involved, which charged him and others with the crime of burning a warehouse upon which there was insurance. The indictment, like that in the instant case, did not allege that the insurance on the warehouse was fire insurance. One of the grounds urged for a reversal was error of the trial court in overruling the appellant's demurrer to the indictment. We rejected this contention by holding the indictment good. It is true the objection here made, that the indictment failed to charge a public offense, was not urged in that case as a ground for sustaining the demurrer, but as in passing on the demurrer the court was not confined to the particular objections made to the indictment, but must be presumed to have passed upon its

sufficiency according to every test raised by the demurrer, whether suggested by the appellant or not, the further presumption would not be unwarranted that if it had regarded its failure to allege that the insurance on the warehouse was against loss by fire, rendered it fatally defective on demurrer, it would have so decided and declared in the opinion that it did not state a public offense.

Under section 340, Criminal Code, a judgment of conviction will not be reversed except when upon a consideration of the whole case the Court of Appeals is satisfied that the substantial rights of the defendant have been prejudiced. It is not every error of law on the record that will justify a reversal, but every error relied on will be subjected to the test, did it prejudice the substantial rights of the accused? If it did, a new trial will be ordered; if it did not, an affirmance of the judgment of conviction will necessarily result. Overstreet v. Commonwealth, 147 Ky. 471; Parish v. Commonwealth, 136 Ky. 77; Hargis v. Commonwealth, 135 Ky. 578; Henson v. Commonwealth, 139 Ky. 173; Middleton v. Commonwealth, 136 Ky. 354; Read v. Commonwealth, 138 Ky. 568; Gordon v. Commonwealth, 136 Ky. 508; Oldham v. Commonwealth, 136 Ky. 789.

Application to the record in this case of the rule referred to furnishes no ground for disturbing the verdict of the jury or judgment of the lower court, hence the judgment is affirmed.